for arguments not to exceed 15 minutes per side. Mark Edmund Brown for the defendant's apology. Please the court, I do wish to reserve three minutes of my time for rebuttal. Good morning, your honors. My name is Mark Brown. I represent the defendant appellate in this case, Baltazar Camacho. Mr. Camacho is here today and we thank you for the opportunity to appear before this court and present his case on his behalf. He's appealing his sentence that was handed down by the United States District Court for the Eastern District of Tennessee, which is a life sentence, but under the new guidelines is now capped at 470 months for his involvement in a conspiracy to distribute cocaine within the Eastern District of Tennessee. Mr. Camacho presents three issues to this court. We probably won't have time to touch on them all today, but they basically can be summarized as follows. One is with respect to the district court's conclusion about the drug quantity, which set his base offense level at a 38. The second issue would be the district court's decision to assert that he was an organizer or leader of a conspiracy involving five or more participants. And the third issue is the imposition by the district court of a two-level enhancement with respect to him possessing a weapon in connection with drug trafficking activities. I'm going to sort of go through those as far as I can get, and I will start basically with the drug quantity. Mr. Camacho was, the PSR in this case, pre-sentence report, was issued prior to November 1st, 2014 and the change in the guidelines. The actual sentencing in this case took place on November 4th of 2014, which was three days, four days after the actual guidelines came into place. So when the PSR was released, the PSR concluded that Mr. Camacho's drug quantity was 150 kilograms of cocaine, which at that time would have been a level 38. As of November 1st, that would have gone down on the drugs minus two to a level 36. The district court, however, in sentencing Mr. Camacho, didn't address, and one thing I do want to point out, is 450 kilograms after November 1st would have taken you to a level 38. The district court in this case didn't determine that Mr. Camacho had distributed over 450 kilograms of powder cocaine in making its sentencing decision. What it did was it determined that Mr. Camacho was set at a level 38 because he distributed over 25.2 kilograms of crack cocaine at that point, which would have been a new level 38. And then adding the enhancements, his guidelines went way up, and even with the acceptance and responsibility credit, he was sitting at a 43 level, which was a life sentence, which as I mentioned is now capped at 470 months. There's two problems with the district court's decision. The first problem is the testimony at the sentencing hearing really couldn't establish how much powder cocaine Mr. Camacho was responsible for. And the second problem is it was based on an assumption that 50% of whatever Mr. Camacho was responsible for had been cooked into crack cocaine by one of the co-conspirators in this case. This case was a little bit like, I sort of had it, when I was handling it, kind of diagrammed as a chart. You sort of had Mr. Camacho up top and then we sort of had tentacles going down from it. And one of the bottom persons here named Kendall Cox had a lot of street level users that he distributed cocaine to. And Mr. Cox at the time was a little bit over the life of this charge conspiracy. And he could only at best guess how much he actually cooked into crack cocaine. Now this is a guy who's been, unfortunately, had been distributing drugs since he was 14 years old. So he knew drug quantities. And he couldn't even Then at the end it was probably more like 50-50, which I think is really where the district court came down and said, well, okay, it's sort of a 50-50 split here at this point. But we had other witnesses, to go back to my original point, which is we didn't really know what the amount of powder cocaine was. We had other witnesses testify at the sentencing hearing, which lasted over two days. One of those witnesses was Mr. Noe Perez-Rosales. And I'll just call him Mr. Perez. And he was actually at the sentencing hearing. It was suggested to him that he would Counsel, did you represent this individual at the sentencing hearing? I did, Your Honor. It's kind of an unusual situation. He had to retain counsel and then he retained counsel. This might be an unusual question, but why couldn't you and the government work out and agree to what quantities your client was pleading guilty to when you pled guilty? Mr. Camacho was the last in the line of the defendants in this case that was actually charged, brought in, and actually pled. And so what happened was the more we go along with it, the more the government wasn't, and I can't obviously speak for Mr. Stone necessarily, but my recollection of it is that they were only offering us the shot to plead guilty to the indictment and challenge the drug quantity at sentencing. There was never any indication we'll set it at X level. If my recollection of the conversations are correct, that I had with the government, it was simply, well I don't know that we can prove at the sentencing hearing the amount of drugs that we could prove at trial. And so based on that representation, I challenged the drug quantity at the sentencing hearing. So that's really the only offer I ever had in place. I never had anything in paper, and Mr. Camacho pled this case on the morning of the trial. Mr. Stone didn't know that, and I walked in that room that morning not knowing that that's what he wanted to do. And I didn't, you know, at that point we were sort of where we are at that point. I'm a little confused by your argument. I mean there was testimony as to a quantity sold, and there was testimony as to what percentage Cox turned into crack. So what are you saying, that it didn't amount to 25.2? No, Your Honor, I don't think it amount, I think the 25.2, what I'm saying is the 25.2 kilograms is based on an assumption that Mr. Camacho should have known or did know that Mr. Cox was turning 50% of the crack cocaine, turning 50% of the cocaine into crack cocaine. He would test a quantity of that cocaine when it was delivered to him to make sure it was acceptable to him before he would purchase it. But what we don't know is if Mr. Camacho could know or reasonably should know that 50% of that was being cooked into crack cocaine. So my position here, Mr. Camacho's position here, is the single most credible testimony about drug quantity came from one of the other witnesses and one of the other defendants, Sergio Gomez. And Mr. Gomez testified that he had basically distributed between 100 and 150 kilograms of powder cocaine for Mr. Camacho over the life of the conspiracy. And that particular assertion by Mr. Gomez was actually, it's corroborated in that he was recorded saying such things. It was recorded saying that he distributed between 100 and 150 kilograms. Well, 100 and 150 kilograms gets us at a level 34 now. Now I know that doesn't seem like much, but it is a lot when you add all the enhancements that were put in there. It basically would save Mr. Camacho about 105 months if his base offense level was brought down. So our position is if there's any drug quantity he should be responsible for here, it's anywhere between 100 and 150 kilograms. Didn't Camacho once bring Cox a microwave to put it down? He did, yes. And I won't, that's the 100 pound gorilla in the room, so to speak. Doesn't that indicate that there's an expectation that he's turning it into crack? That is an indication that there is an expectation. Yes, he was testing it and does he know or reasonably should he know that 50% of that was going to be turned into crack cocaine? And the only testimony we have that 50% was going to be turned into crack cocaine comes from Mr. Cox himself who could just say, well I probably turned 50% of it into crack cocaine. And that's really all we have. So yes, while there is an indication there that Mr. Camacho would know there was going to be crack cocaine, is there an indication that it would be over 50%? With respect to some of the other witnesses that were presented at the sentencing hearing, Mr. Vivanco Villa, I guess he and I had a communication issue. He didn't speak English, I don't speak Spanish, but the best I could decipher out of him ever was that the only amount of quantity of drugs he could ever put his finger on was when he showed up at Camacho's house, there were 20 kilograms of cocaine in a cooler. So 20 kilograms is about all we could ever decipher out of him. And even Mr. Cox himself, the man who was turning the cocaine into crack cocaine, said in his testimony, there are two relevant periods of time here, that perhaps one time he had 40 to 50 kilograms he bought from Camacho, the next time it was 60 to 67 kilograms. So that would get right in that same range of what we're talking about is the 100 and 150 kilograms. The district court here concluded, and I know my time is running short, that the defendant here, Mr. Camacho, my client, aided and abetted Mr. Cox in distributing crack cocaine because he knew that that's what he was doing. But even if we concede that, and we're not conceding that, that he aided and abetted, but even if we concede that, we still have the problems. We don't know how much powder cocaine was distributed, and we don't know for sure how much was turned into crack. That's why the district court's drug calculation was incorrect, and we're asking it to reverse and re-sentence based on a lower offense level. Thank you, Your Honor. Thank you. Good morning, Your Honors. I'm Tracy Stone, here representing the government this morning, and I was the AUSA below in this case as well. So if I could just start there, and Judge Clay, answer your question that you asked about why wasn't an agreement reached. It sounds like the man was permitted to plead guilty without knowing what quantity he was pleading guilty to, and therefore not knowing what his exposure was. I have firsthand knowledge, and I can, I think, clarify that for the court. Mr. Camacho was represented by retained counsel to begin with. He wasn't the last defendant in the conspiracy to be arrested. He was arrested late in the conspiracy, frankly, because he fled to Atlanta, and we had to find him. After the takedown, he wasn't grabbed up in the initial takedown. So I can assure the court that an offer was made to him, and that offer was exactly the offer made to Sergio Gomez and Kendall Cox, his two biggest customers. He was offered the exact same thing, and he turned it down. I certainly wasn't going to offer him a better deal than I offered his customers, but I did offer him the exact same deal. Also, he was given a chance to speak with us and tried to sell us on an argument that he was only an ounce dealer in the wiretaps-related ounce quantities as opposed to kilogram quantities. So that door was shut, and that's the reason it was in the posture as it was. Now, frankly, if I was the defendant, I probably would have pled the way he did openly and contest all these issues because I wasn't going to agree on behalf of the United States as something lower than what co-defendants had pled to. So that's why we're here, and that's why we had a two-day sentencing hearing. They pled to the 25, to over 25 grams of the crack? Two levels less. The same offer I made Camacho, which he wouldn't plead to, was two levels less, 36 instead of 38, and he wouldn't agree to that. And so once we got to the morning of trial, no, of course I didn't make a deal with him. We'd prepared for trial. The jury was in the courthouse, and if he wanted to plead to the indictment, he could plead to the indictment, which typically is the practice of our district judges anyway. We have a plea cutoff, and if they don't plead by the plea cutoff, then they have to plead to the indictment or go to trial. And that's what he did. So what's the evidence that it was over 25? Yes, and that is the touchstone. So let me clear up. I think the evidence has been distorted a little bit here. The universe seems to be defined by counsel to include essentially three people, Camacho, Gomez, and Cox, and Gomez and Cox, there's a lot of overlap there. Well, that isn't the conspiracy. There was evidence produced at the sentencing hearing through basically all of the witnesses that Camacho had a lot of customers. So this capping the conspiracy at 150 kilos or whatever Cox and Gomez got together is a bit of a red herring. It doesn't assist us in deciding what the conspiracy involved. Judge Varlin, using very conservative estimates, even noted that the conspiracy likely involved more than 450 kilograms. In other words, the defendant himself distributed personally over 450 kilograms. But he didn't feel it necessary to reach that finding because of the crack finding. So conservatively, I think it's safe this morning to say that Camacho distributed no more than 450 kilograms as a conservative estimate, which is the standard of review. What's a conservative estimate? So how then do we decide what was really foreseeable for Camacho? And what I would ask the court to do, and I'm not going to go into a lot of detail here, is to go and review the testimony of Detective Jared Whitson. I was thinking about this in preparation and went back and read his testimony. And the whole reason, basically for every question I asked him, was to show the court that Baltazar Camacho was a large-scale, very sophisticated drug trafficker. And we went through a laundry list of factors from his range of 10 kilograms per week in Knoxville. That's a very large number for a city the size of Knoxville, to his counter surveillance, to his phone discipline. And I'm not going to go through the laundry list, but it's in there. And the point was, is someone of that level, if the court were to believe that, would lend itself to a conclusion or inference that this person doesn't know that the cocaine he is selling is to be sold as crack. As Jared Whitson testified, in his view in the United States, about 90 percent of cocaine is sold as crack. So we know that Kendall Cox, in his presence, cooked up an ounce from every kilogram. So in the one occasion where Baltazar Camacho brought the microwave, seven kilograms he brought, and Kendall Cox took an ounce from each one. So he knew firsthand that at least some was being sold as crack cocaine. So the question is, what was foreseeable? Well, 50 percent is a very low number. And that's just Kendall Cox. That doesn't say anything about what Kendall Cox's customers are doing with it. Jared Whitson also testified that there were interceptions of Camacho where he was dealing with complaints about the quality of the cocaine cooking into crack. And he said, well, I have other customers doing that, and they're not complaining. So he knew. And the numbers that I would point out, 25.2 kilograms of crack is less than 5 percent of 450 kilograms of powder. And so the question is, was it foreseeable that the defendant, under this standard and this evidence and this record, that the defendant should have known that at least 5 percent or a little less than 5 percent of all the cocaine he sold would have been cooked up into crack? And when viewed in that light, Your Honors, I believe that the question is definitive. It's not even close. And also, just touching upon leadership and the firearm, the same inference, I believe, would apply there, in that a sophisticated drug dealer like Camacho is going to have employees. He's going to carry firearms. There was testimony about that both directly from people who knew him and trafficked with him and from a law enforcement officer based on his training and experience. All of it was contested. All of it was unrebutted. In the view of the United States, even on cross-examination, the testimony of all the witnesses stood up. And so, in our view, based on the standard of review, I just don't see how Judge Varlin can be faulted for making very conservative estimates in making the factual findings he did. And I see I have time left, but unless the Court has questions, I would yield it. All right. Thank you very much. Please, the Court, Your Honors, just briefly to address a couple of things that Mr. Stone brought up in his presentation. Mr. Camacho's retained counsel was involved in those conversations initially, so I wasn't privileged to those. So to the extent that maybe anything I said was incorrect, I apologize for that because I just simply wasn't involved in those conversations. The only conversations I had were you can plead out to the indictment and take your chances at the sentencing hearing or we can try this case, which we were prepared to do on the morning of. With respect to Investigator Whitson, while I have all due respect for our investigators and the jobs that they are doing out there because they have very difficult jobs, these investigators tend to take a one-size-fits-all approach. And that's based on their training and experience, and I understand that. But one size does not always fit all on the case. And just because all drug dealers carry firearms doesn't mean this particular defendant carried a firearm. Just because most of the cocaine that's put on the streets is put into crack doesn't mean that this particular defendant should have known or reasonably should have known that 50% of it was going to be cooked into crack. So it's a one-size-fits-all. It was his opinion, testimony, and interestingly enough, to look through the prism of Jared Whitson's opinion, we look at this fact. He testified at court on November 4th, 2014, that Mr. Camacho had to distribute over 450 kilograms of powder cocaine. That's exactly what he needed to say, because the new guidelines kicked in four days earlier and they said 450 kilograms was a level 38. So it was simply an opinion of the investigator, and as I've said, we don't believe the drug quantity was calculated correctly and all the other enhancements were not done correctly, and we're asking this court to remand the case back to the district court for resentencing. Again, I thank you for your time and your opportunity to be here this morning. Thank you. Thank you, Mr. Brown. The court knows you were appointed under the Criminal Justice Act, so we want to thank you for taking the case and for your service. Thank you, Your Honor. It was my pleasure, and I enjoyed working with Mr. Camacho. Thank you. The case is submitted. The clerk will call the roll.